We'll take that case under advisement. We'll now turn to case number three, United States v. Ashantae Corruthers. Mr. Adams, good to see you. Whenever you're ready. Thank you. May it please the Court. The District Court's 48-month sentence of Ashantae Corruthers is substantively unreasonable. The District Court set her advisory guideline range between 21 and 27 months and ultimately imposed a sentence almost double the high end of the range. In explaining the 3553 factors weighing in favor of an above-guideline sentence, the District Court cited several, frankly, mitigating factors for Ms. Corruthers, including her lack of criminal history, her lack of any violations while on pretrial release, the fact that she was not the leader or fulcrum, was the District Court's phrase, of this criminal activity, and the fact that she ultimately pled guilty and while she didn't receive acceptance of responsibility points, did accept her responsibility for the conduct in which she committed this crime. The District Court also talked about the circumstances of surrounding the offense, right? Yes, Judge. That she lied to the authorities not once but twice, and even after she found out that it involved the shooting of Mr. Lafayette and Officer Oberheim, that she continued to lie, and that she also knew Lafayette personally and all the other circumstances. Why isn't that enough, along with the District Court's policy disagreement with regard to the way the sentencing guidelines deal with straw purchasers? For two reasons. First, all of the conduct is incorporated into the guideline calculation. She received the two points for obstruction. She was charged with obstruction and pled guilty to that. She didn't receive the three points for acceptance of responsibility because of her obstructive behavior. With respect to the first part about her conduct here, I believe that the circumstances of this case, the judge specifically said that he was not using this as sort of revenge for the officer-involved shooting that occurred after Ms. Carruthers provided the gun to the co-defendant who then gave it to Mr. Lafayette. So because the court's explicit statement that this was not a revenge sort of sentence and she wasn't considering the officer's death in the sentence imposed, that would create a question as to why then issue a sentence almost double the high end of the range. So basically the judge's entire explanation would account for either a within-guideline sentence or a below-guideline sentence given Ms. Carruthers' lack of criminal history. Just so that we can level set, just to make sure that we're clear, is there any contention that the guidelines were not calculated properly? Not by Ms. Carruthers. The government obviously does think that the district court erred by not including the cross-reference, and I'm happy to address the cross-reference. No, I just want to, for Ms. Carruthers, her position, were the guidelines calculated properly? Yes. Okay. Yes, sure. And we believe a sentence, again, over the guidelines requires, as this court has said, requires extra scrutiny the farther up you get from a above-guideline variance. And because the variance here was so high, there needs to be at least some explanation other than merely a policy disagreement. A policy disagreement coupled with some sort of 3553A factor analysis. And the analysis provided here simply showed that a guideline sentence would have been a reasonable sentence. Mr. Adams, just because something falls or is considered in calculating the guideline range, would that preclude the court for relying upon those factors under the court's 3553A analysis? I don't believe it would preclude the court from relying on any reasonable and reliable factors under 3553A. So it wouldn't be considered impermissible double-counting, for example. The fact that she, you know, that her obstruction kind of impacted her guideline range and the court then also considered it as part of the court's kind of consideration of the nation's circumstances of the offense. Nothing would preclude that, but in this case, the district court specifically said he wasn't going to double-count and consider the obstruction as an enhancement under 3553A. He found that that was, again, I guess, baked into the sentencing guidelines here and that the 21- to 27-month guideline range accounts for all of that conduct. I think if we also look at the co-defendant. Did he articulate why as a – I'm just going to focus on the fact that Ms. Carruthers was a straw purchaser. Did he offer any reasoning for why he was going almost double the high end of the guidelines? One of the reasons the district court enumerated was that this case, in his words, were, quote, really bad. He did not explain any further as to why or articulated how it was bad. Given a similar case in the Northern District of Illinois in which a straw purchaser purchased a gun that also resulted in an officer-related shooting and death, received 30 months. That was cited in Ms. Carruthers' sentencing memorandum. The district court found that Ms. Carruthers' case was worse than the case cited and did not give a fuller explanation of how it was worse. He just merely said it was worse and explained that as a reason for going above the guidelines. So it's our position based on Higdon that there needs to be more. The record has to be more developed. There has to be a better and greater explanation as to why either one case is worse off than the other and why that other case or this case justifies an above-guideline sentence, and that was not done here. And for those reasons, Judge, we're asking that the court reverse and remand. If the court has any other questions, I believe I've reserved the rest of my time for rebuttal, which I assume the government is going to raise. That's fine. Thank you. Thank you, Your Honor. Good morning, Mr. Miller. Good morning. May it please the court, counsel. The United States is asking this court to reverse the finding of the district court in refusing to apply the cross-reference at Section 2J1.2c and remand for resentencing. And our position is that that issue alone, should the court agree with the United States, would address the defense argument that the judge improperly deviated upward from the guideline range because the United States argues that the properly calculated guideline range is well above the 48-month sentence that was imposed by the court in this case and should have been calculated 97 to 121 months, which is also in line with the sentence that was imposed about the co-defendant in this case of 102 months. In this case— In Lewis, I'm just not familiar with that one. Was 2J1.2c1 applied? It was not. The government asked for it to be applied. In fact, that is the factual basis that's then included in the brief. The United States presented the testimony of the ATF task force officer, Kolesh Hueska, who testified unrebutted that the ATF was assisting the Illinois State Police in two separate homicide investigations and detailed how the defendant in this case, Ashante Carruthers, provided false information in relation to those two homicide investigations. The judge made the same ruling for each defendant, made the same ruling both for Ms. Lewis and Ms. Carruthers, and found that section 2J1.2c did not apply. The United States believes that is clear error in this case. The review of this court on the application of the guidelines is de novo. Certainly, this court reviews a district court's factual findings for clear error, but the facts aren't really in dispute in this case. Again, the testimony of the ATF officer was undisputed. It was simply the district court's interpretation of those facts. Well, I'm not sure whether that's completely accurate because one of the factual assertions made by the government was that there were two parallel murder investigations, right? And the district court's findings, one could read the district court's findings to say that the court did not find that credible and that, in fact, the only investigation there was was an investigation into whether or not the shooting of Mr. Lafayette was warranted, right? Yes. What he called a righteous shooting, I think. And so why isn't that a factual finding that we review for clear error as to whether or not he believed the ATF officer or whether he didn't? I think that would be fair in this case. The judge made no findings that the officer was not credible. He relied on the facts that were testified by the officer. There was no rebutting of the officer's testimony. So I believe a fair reading of the record is the court did rely on the testimony of the officer and did not find it not to be credible, but simply they interpreted it differently. And especially in looking at the record, the district court didn't say there was no investigation of the shooting of Officer Oberheim, which the evidence shows there was. He simply ignored it. He did not comment at all on the investigation of what was clearly a first-degree murder of a police officer. The court did not mention it at all. Instead, he turned to the testimony of the officer. Yes, sir. Mr. Miller, I'm looking at the transcript of Ms. Lewis's sentencing hearing. And on page 32 of the district court, after talking about, you know, was it a righteous shooting? And today I heard about a dropped gun. I didn't know about that before today. So my terminology was was that a righteous shooting by an officer, and that's different than a homicide. So from a technical point of view, I find the nature of the investigation was not a homicide. Why isn't that a factual finding? Yeah, and I do want to address that because that is a conclusion because there was no evidence of that right before the court at all. It was the court's conclusion based on the testimony of the officer, which he didn't find not credible that it was a righteous shooting investigation. But just—and let me just say this. To the extent you find that that's a finding, the United States position is that was clearly erroneous. So that would be our position on that because under these facts, the district court considered it like an internal affairs investigation, right? It would be done where internal affairs would look at should the officer be suspended. That was not what was taking place here. As the evidence showed, this was not the Champaign Police Department investigating. This was the Illinois State Police investigating with the ATF at a time as we laid out in the brief. Certainly any time there is an officer-involved shooting of a civilian, there is an investigation. But certainly in the context as we laid out of this time, it was a very tense situation. Several days later, the family of Mr. Lafayette, who had been killed, said they didn't believe he had a gun in his hand. So this was—it was clearly erroneous to interpret an investigation as to whether Officer Creel, who had seen his partner get killed and had taken another man's life, was now facing whether he would be facing perhaps criminal charges, which would be second-degree murder, for taking another man's life. And that investigation as to where that gun came from at the scene, there was testimony as to whether it was a drop gun or not. The judge said he was not familiar with a drop gun but did not find the officer's testimony not to be credible. And so we believe it was clearly on these facts. It would be erroneous to say it was a righteous shooting investigation rather than an investigation into potential second-degree murder charges. So, Mr. Miller, going along those lines then, how—so Mr.—so Officer Creel, right, he fortunately survived the shooting incident. And he then was able to state he was a witness to the fact that Mr. Lafayette drew that gun, fired and shot and tragically killed Officer Oberheim, and then also shot at him. The—and Mr. Lafayette then also was killed. So how exactly would Ms. Carruthers' statement as to whether or not she was the one that purchased the gun, how would that either impede or assist the two agencies in their investigations as to what happened in this case? The first point—I want to answer that question. The first point is it does not need to under the application of the Guideline, and we cite the many cases for that. But in this case, it actually did initially. We understand—we're here now. We know how the investigation went. Officer Creel's statement of the events fully credible and corroborated by all the evidence in the case. This is two days after the investigation. There are questions of whether his— But if you didn't believe Officer Creel, then what—then the only—at least in my mind, the only conceivable theory would be that he brought the gun to the scene, shot his partner, and shot Lafayette, and then planted the gun. That doesn't seem like a very realistic scenario. I would say that there were lots of possible scenarios. Can you tell me one that would actually seem at least conceivable? As far as—on the facts as we know them now. Well, an example is that someone besides Lafayette shot Officer Oberheim, someone else who was there or at the scene. Again, they're investigating this. And therefore, then the officer, when he shoots Lafayette, who is not a shooter and doesn't have a gun in his hand, he would be responsible for second-degree murder. And trying to figure out if that gun was in Lafayette's hand was crucial to that investigation at the time. Again, he had family members' eight days' letters. And at that time, the authorities had some questions as to whether Officer Creel was correct in saying that he was there, he was shot, he saw the gun, he saw Mr. Lafayette draw his gun? I believe that—so the Illinois State Police and ATF were conducting a thorough investigation. I don't—we could not expect anything less following the shooting of both a police officer and a civilian who were both killed. They're conducting a thorough investigation assuming nothing. They trace the gun, the facts that they have, and they go to Ms. Carruthers as part of that investigation only two days into the investigation. And she lies to them and tells them that she doesn't know Lafayette, who she provided the gun to. And so the argument is that does set—the officer, the ATF agent, had testified that he had—or had said that he had believed her. And so there was more investigation. How did that gun get to the scene? Ultimately, we now know what happened. And to go to the second point, just the application of the guideline applies whether or not it actually impedes or obstructs the investigation, the obstruction of justice that took place. It's—the guideline is clear. If the offense involved obstruction of the investigation or prosecution of a criminal offense, and it says then apply 2X3.1, it doesn't require at all—the guidelines themselves don't require it. And the case is made clear it doesn't require it. If you obstructed the investigation of a criminal offense, you then go to 1B1.5A, note 3. It says consistent with the provisions of 1B1.3 relevant conduct, such other offense includes conduct that may be a state or local offense. And when there is more than one such other offense for the investigation, the most serious such offense is to be used. So it's very clear. It's direct—the application of the guideline applies. If you were convicted of an offense that falls under 2J1.2, which Ms. Crothers was. She was convicted of the conspiracy involving 1512. B2 falls directly under that guideline. Then you go to the cross-reference, and the cross-reference says if the offense involved obstructing the investigation, then you apply the accessory. The cases—we've cited the First Circuit case in Fleming— Before we go to those cases, the application note 3, convictions for the underlying offense, and that commentary, where it tells us in the event the defendant is convicted of an offense, go to Chapter 3. You're saying note 3 to 1B1.5? 2J1.2. Oh, 2J1.2. Yes. I'm sorry. The question? Before we get to—you were reading 2J1.2. That's where you started. Yes. So when we're reading that section and when it is applied, when to apply it, if the offense involved obstructing the investigation or prosecution of a criminal offense, apply the accessory, right? The 2X3.1. Yes. But in that same section in the application notes, I'm asking for—and this is where the judge was talking about it— the sentencing under the application notes, particularly application note 3. Where it says that frequently— Yeah. Frequently a person who is obstructing justice is attempting to avoid responsibility for themselves or for another person. First, to address that just as a factual matter, in this case, Ms. Carruthers said—now, legally she was mistaken, but factually she said she lied to the officers because she was afraid of being charged with murder. So I think that applies factually, that note. I would also want to go, just as a legal matter, that note only says frequently. And there's been—and we cited the case in there that addressed that specifically. I think it was the Scott case that was addressing a similar cross-reference for perjury, which is very similar to the one for obstruction of justice. And there the court said frequently doesn't mean always. And although it is suggesting why this cross-reference applies, it doesn't require that the individual who engaged in the obstruction of justice was successful in avoiding criminal liability for themselves or others. And, in fact, the Scott case, which is very interesting to look at, that was a case where a police officer testified falsely at a trial to convict someone. So the officer was not trying to escape criminal liability himself or for another person. He was trying to convict someone, and the court said that cross-reference still applied because he engaged in obstruction of justice regarding a criminal offense. And even though it wasn't to exculpate somebody, it was to inculpate someone, by its plain terms, the guideline still applies. Mr. Miller, I wonder if I could invite your attention to the other part of this case, the appeal of the defendant and your defense of that. I wonder, every year the United States Sentencing Commission issues a report as to the sentences imposed for every offense in the United States Code. And it lists how many are within the guideline range, how many are not, and if they are not, how far the deviation is. And I wondered if by chance you had consulted that reference and could tell us whether what the judge did in this case is within the heartland of variances, of departures, or whether this was well beyond the heartland of those variances and departures. Your Honor, I apologize. I have not consulted that. We were a pilot district, and they were attaching to the pre-sentence report something called – and if I may continue, I believe my time has expired. You may go ahead. It's called a JSON. They would attach and discuss what the average sentences were for an offense. I don't have that data here. Did the district court have that before it was sentenced, do you know? It would have had access to that data. It would have access, but do we know whether he actually had it before? I apologize. I don't know if the record shows that the district court consulted the JSON data or not. It seems to me in a way that's the 500-pound gorilla in the room here. Did the judge do something that was really off the charts here? Or have a lot of district judges taken this position? I think that's something we'd like to know. I guess what we do know, if I may say, is of course our position is it's not off the charts at all except perhaps low because of the inapplicable – for not applying the guideline. But the court did cite extensively in support of the variance its policy disagreement with the guidelines citing the Seventh Circuit's case in the United States v. Davis. So it at least cited the Seventh Circuit's approval of an upward deviation in a straw purchaser case because of the inability of the guideline that the court applied to take into account the consequences of the conduct, which we believe would have been taken into account already if the court would have applied the correct guideline. I see. Thank you. Thank you. Thank you. Mr. Adams? Thank you, Your Honor. With respect to Judge Ripple's question about statistics, that would have been attached to the PSI and would have been in the very last couple of pages. I don't recall right now if that was present from his brother's sentencing, but it should be in the PSI at the end. But you don't know whether it's there or not? I can't say with certainty right now if it's there. We can certainly check the PSI and see if it was. Yes, Your Honor. If it's not, well, that's up to counsel. And I'll touch on one thing that the government said in its presentation, that the investigation was to the shooting death of the officer and where the gun came from. I think that is probably the most significant part here is where the gun came from is the subject of the investigation when the officers went to speak to Ms. Carruthers. And if we look at the commentary background for 2J1.2, the purpose of the cross-reference is where a defendant attempts to avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for that offense. And so if that's the case here, then it can't be first-degree murder because Ms. Carruthers did not commit the first-degree murder and Mr. Lafayette is deceased, so she could not have been helping him. The only reasonable answer from the record is that she was trying to distance herself from the purchase of the gun. And that's in the addendum to the PSI. That is in our appendix, I believe, at page 11. So it's not that she felt that – she may have had the layman's belief that she could be responsible for accessory to murder. However, as the government acknowledged, that's irrelevant. It's an irrelevant legal fact in this case. Lastly, I'd like to leave the court with this, that this murder sadly was caught on body cam. So from the – at the moment that officers went to interview Ms. Carruthers, they had already watched the body cam run. There was a – the shooting all was encompassed there. So the question of whether there was a drop gun or not I think was not raised at the last minute, but it was not supported by the record until sentencing. And the judges identified that, that he had not heard about that until sentencing for the co-defendant. So what did the body cam show exactly? It showed Officer Oberheim getting shot. It showed Officer Creel shooting Lafayette. And did it show Mr. Lafayette using his gun? I believe so. I have not seen the body cam, but I was reading the – from the discovery tendered at the district court level. That's what was included. I have nothing further – if the court has no other questions, I have nothing further. Thank you very much, Mr. Ash. Thank you, Your Honor. Thank you, counsel. I will take the case under advisement.